*Reversed and dismissed.*

Opinion delivered June 25, 1884.

[No. 2935.]

### T. P. WOOD v. THE STATE.

1. DISTURBING RELIGIOUS WORSHIP—DEFINITION OF "WILFUL."—The gist of the offense of disturbing religious worship is that the disturbance was "wilful." The word "wilful," when used in a penal statute, means with evil intent, or legal malice, or without reasonable grounds of believing the act to be lawful.

2. SAME—FACT CASE.—See evidence *held* insufficient to support a conviction for disturbing religious worship, inasmuch as it does not show the disturbance to have been wilful.

APPEAL from the District Court of Burnet. Tried below before the Hon. W. A. Blackburn.

This was a conviction for the wilful disturbance of religious worship. A fine of twenty-five dollars was the penalty imposed.

W. O. Shugart, for the State, testified that he was present at what the people called preaching at a school house near Corwin, Burnet county, on the third Sunday in March, 1883. Reverend Mr. Hansboro conducted the exercises, and during the sermon propounded a question, which the defendant proposed to answer by asking a question. Mr. Hansboro told him not to interrupt him. The preacher went on to say something about a "mighty rushing wind." The defendant spoke up: "Yes, and there was a sound in that wind, too." The preacher then said to defend-

ant: "If you want to talk, you go outside." The defendant in-
terrupted the preacher two or three times with questions, in a
voice which could be heard all over the house. The congrega-
tion was composed of thirty or forty well behaved people. The
witness paid as much or more attention to the defendant than
to the preacher.

J. D. Kennedy, for the State, substantially corroborated the
first witness as to what transpired on the Sunday in question,
and stated in addition that he was present on the evening before,
when the same preacher conducted services. He stated at the
outset that he invited prompt correction, during services, if he
misapplied the Bible; that he wanted anyone to correct him if
he stated anything wrong. Defendant asked the preacher a
question that night. The preacher replied: "We will talk about
that to-morrow. In the meantime you read the tenth chapter
of Acts." Defendant asked the question in a very polite man-
ner. When services closed next day, Sunday, after the occur-
rences related by Shugart, defendant rose in his place, with Bible
in hand, and asked the congregation to remain a few minutes
and hear him. Witness saw Mr. Barnhart speak at that time,
but did not hear what he said. The little episode seemed to
arouse some feeling in the congregation.

J. S. Barnhart testified, for the defense, that he reached
preaching on the Sunday in question about ten minutes before
the services concluded. Defendant did not interrupt the preacher
while witness was there. When the congregation was dismissed
the defendant, with his Bible in his hand, called on the congre-
gation to give him attention while he read a few passages from
Scriptures. Witness walked down the aisle, met the preacher
and said to him: "Let's have no controversy." He went on to
defendant and made the same request. Defendant replied:
"This is none of your business; you are bad medicine anyhow;
I want nothing to do with you. If you want anything out of
me you can get it. Name your time and place, for this is no
place for trouble." Mrs. Kennedy, the defendant's mother-in-
law, then took defendant's arm and said: "Shut up your mouth,
and let's go home." The preacher, Mr. Hansboro, was a Chris-
tian or Campbellite, and was conducting a series of meetings at
the time and place. There was feeling existing between witness
and the defendant at the time.

I. D. Standifer testified that, some time before the meeting in
question, he and defendant (he being a Campbellite and defend-

ant a Baptist) had a theological argument, in which defendant said: "If your church can convince me that faith comes before repentance, I have nothing more to say. Your church can then baptise me." Before the Sunday in question, witness told Mr. Hansboro about this conversation, and requested Mr. Hansboro to preach a special sermon on faith and repentance for the benefit of defendant, as the defendant was an intelligent, conscientious and influential citizen. It was the custom of the Campbellite church to invite questions, etc., during service, and they did not regard the practice as interruption. After the occurrences of Sunday, Mr. Hansboro told witness that he did not answer the question propounded, because defendant insulted him that morning by introducing him to McElroy in this wise: "Brother McElroy, let me introduce you to Brother Hansboro, my old Campbellite friend." Mr. Hansboro said: "I don't wear the name," and walked off. Witness was not present when the disturbance took place.

T. H. Hagar testified, for the defense, that he and defendant sat near together, and near the preacher, at the time of the alleged disturbance. The preacher stood almost in front of witness, and talked right in the defendant's face. The preacher was talking about the "Day of Pentecost, when there came a noise, as of a mighty rushing wind, and filled the house." He asked some questions, and defendant asked if he might answer them. The preacher replied, in a loud, harsh, gruff voice: "If you want to talk, go outside." The preacher went on to say that the Holy Ghost fell on no one but Peter; that it "just wholloped itself around Peter's tongue and made him say anything it wanted him to say." The preacher, during the service, spoke of the Bible as the Holy Ghost. The defendant called out: "Yes, like a crank is the lever of a mechanic's machine." Witness related the subsequent proceedings as the previous witnesses did. The defense witnes s s concurred in the statement that the defendant spoke in a respectful manner.

The motion for new trial relied upon the insufficiency of the evidence to support the verdict.

*Cook & McSween,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.    Appellant was convicted under an indictment charging him with wilfully disturbing a congregation assembled for religious worship, "by propounding loud and audible questions to the preacher or elder, while conducting said religious services, and by using angry words and gestures," etc. As made by the evidence and the able brief of counsel for appellant, the case in some of its features is most interesting and presents for theological or ecclesiastical disputation questions more intricate and perplexing than are the matters of law involved in its determination on this appeal.

A disturbance of religious worship under the statute (Penal Code, Art. 180), to be punishable, must have been wilfully done. "Wilfully" is the statutory word which characterizes the offense.    "When used in a penal statute, the word 'wilful' means more than it does in common parlance.    It means with *evil intent* or legal malice, or without reasonable grounds for believing the act to be lawful." (*Thomas* v. *The State*, 14 Texas Ct. App., 200).

Taking this as the meaning of the word "wilful," we are of opinion that the evidence in this case does not sustain the conviction.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 25, 1884.